### THOMPSON v. WALSH.

(Circuit Court, S. D. New York. July 28, 1905.)

#### No. 5,873.

MINES—SUIT TO ESTABLISH ORAL MINING PARTNERSHIP—EVIDENCE CONSIDERED.

Evidence considered, and *held* insufficient to establish an oral mining partnership which entitled complainant to an accounting for the proceeds of certain mining properties which were acquired by defendant and operated by him for several years without any claim to an interest therein having been asserted by complainant.

[Ed. Note.—Mining partnerships, see note to G. V. B. Min. Co. v. First Nat. Bank, 35 C. C. A. 515.]

In Equity.

John W. Griggs and L. Barton Case, for plaintiff.
Charles S. Thomas, Julien T. Davies, and Julien T. Davies, Jr., for defendant.

PLATT, District Judge. The gist of this voluminous bill in equity follows: It first attempts to establish an oral mining copartnership agreement between the parties for the purpose of prospecting, locating, purchasing, and operating certain mining claims in and about Ouray county, Colo. Having set up such a copartnership, and having defined, as best it can, the terms thereof, it asks that the matter be referred to a master for an accounting, that the copartnership be then dissolved, and that the plaintiff have judgment for the amount which may be found to be his due. The arguments were exhaustive, and an examination of the record and briefs has consumed much time. The present treatment of the matter will be brief, and somewhat sporadic. From about 1875 the defendant, Walsh, was extensively engaged throughout the West in mining operations, either alone or with others. Plaintiff, Thompson, went to Colorado in 1888, without mining experience. His first experience in that line, of any moment, was with Walsh and several others in the Ben Butler mine. The Ben Butler was operated in the fall of '94 and spring of '95, but Walsh took no active part, having many ventures of his own near by. In 1895 the

same parties leased the Helena, but did not work it, and later in the same year leased and worked the Hilltop for a couple of months. At the same time Walsh had various independent ventures. In the spring and summer of 1895 Walsh started investigation at Imogene Basin, in Ouray county, and acquired the Cosmopolitan group of mines in that basin during the following winter. During the winter of 1895–96, Walsh vibrated between Denver and Cripple Creek. He helped Thompson get together the Chancellor group, but was not interested personally. He took a small interest with Thompson, Clinton, and another in one or two prospects, and let Thompson into a half interest in the Last Quarter. This was the only claim in which Walsh and Thompson were interested, without others, during that winter, at Cripple Creek, and Walsh looked after the Last Quarter himself. Walsh spent only a small portion of his time at Cripple Creek that winter. Mr. Walsh went to Ouray in the spring of 1896 with a definite object in view. He intended to develop the Cosmopolitan group of mines by applying new processes to those mines and to others which he was acquiring, and by systematic working on a large scale to obtain a fair return from the low-grade lead-bearing silver ores which seemed to dominate and control that region. As part of this plan he was out nearly every day in the later part of the summer, buying up cheap claims, which by such treatment might yield fair returns. About September 15, 1896, he discovered gold on the Gertrude claim, which was one of the Cosmopolitan group. This turned out to be part of a rick gold-bearing vein, which developed wonderfully, and has made the defendant a very rich man. Thompson claims to have established by proof that in the spring of 1896 Walsh and he "talked over" what they would do that summer, and that Walsh said that he would write from Ouray, and tell him as soon as the country was in condition for prospecting; that subsequently he received a letter from Walsh, telling him to get ready and come down as soon as he could, and stating that anything Mr. Walsh had, or that they should find, they would be mutually interested in; that thereupon Thompson and his family and Mrs. Walsh went to Ouray; that upon reaching Ouray he and Walsh "talked over" at the hotel what they would do; that Walsh mentioned several promising properties, and said that they would examine them under an agreement that, if they found anything valuable, they could operate it jointly, the same as they had their Cripple Creek properties. The letter has been lost, but he produces his wife, who testifies that she saw it, heard him read it, read it herself later, and corroborates the important part of it, except that she remembers that Walsh said "equally" instead of "mutually." Thompson does not claim, however, that either at the hotel or at any other time he called Mr. Walsh's attention to the remarkable language of the letter, and admits that he never asked Walsh to let him in on shares with any properties which Walsh had acquired before Thompson came. It is on this confused story, as I understand it, that Thompson bases his oral agreement, and I must confess that I am not clear as to

what that oral agreement is. If they were to operate jointly, in the same way that they had worked on Cripple Creek properties, anything they should find which was valuable, the proof is incontestable that they had not operated jointly any Cripple Creek properties. Further than that, they found nothing of value in the Imogene basin, and did not prospect, locate, or operate jointly any claims which they visited together in or about that basin. The only well-defined case of a joint visit and examination is that of the trip to the Oro Cache. Plaintiff's proofs tend to show that, in pursuance of the alleged agreement, Mr. Walsh and himself took a trip up the American Nette trail on July 6th; that they examined the Oro Cache claim, and took samples of ore, which were sent to the assay office by Mr. Walsh, who reported later to Thompson that the samples did not show paying values, and that it was not worth while to take hold of the properties; and no joint operation of the claim was entered into. Defendant denies the agreement in toto, and naturally denies that the incidents of the Oro Cache trip had any relation to such an agreement; but, if the plaintiff's proofs about that trip be accepted as true, he is still far away from the mark at which he aims. It is a fact that no value was ever found in the Oro Cache claim. Mr. Walsh made his gold strike on the Gertrude, in the middle of September, and much later—in the winter or spring of 1897—he bought the Oro Cache and many other claims, so as to prevent possible trouble from parties who might buy claims on the sides of the discovered vein. September 14, 1899, he bought the Chicago for the same reason. There is no evidence that Thompson and Walsh ever investigated together any of the claims which turned out afterwards to have values. On the day of the visit to the Oro Cache, Thompson says that they examined also the Chicago, to accommodate one Charles Clinton, who had an interest in it. The samples from the Chicago did not run in paying quantities, and Thompson was so informed. The only properties in Ouray county which Thompson claims that he and Mr. Walsh actually operated together are the "Senator" and the "Old Lot" dump. The evidence satisfies me that Mr. Walsh was not interested in either of them. In the fall of 1896, and again in the spring of 1897, Thompson was engaged in operations at Red Mountain, in which Mr. Walsh had no interest. A trail over the mountains, not more than six miles long, connected Red Mountain with the Imogene basin. In the fall of 1896, after striking the gold vein, Mr. Walsh increased his holdings by buying many claims in addition to the Cosmopolitan group. The ore taken out and carried to the smelter had shown such enormous values that Mr. Walsh desired a single name for the group, and he selected "Camp Bird," because of a little bird which is very friendly and neighborly in all mining camps. Discovery of gold in a county only known for its lead and silver ores was naturally a matter of the greatest interest. The surrounding country was on fire with the news, and yet Mr. Thompson insists that he knew nothing about the Camp Bird mines for a long time, and when he did learn about their success he was

not interested, because he thought the Camp Bird claim was in the United States group, several miles away from the Cosmopolitan group. In fact, the United States group is within a mile of the Gertrude and Oro Cache. From the evidence I am satisfied that Mr. Thompson not only knew about the Camp Bird mines and their successful operation in '96 and '97, but told others that Walsh was lucky, had struck it rich, was going it alone, etc.; and during all that time, and for years thereafter, never lisped a syllable to Walsh about the letter or the oral agreement upon which he now counts so heavily. Notwithstanding all this, the friendship between the men and their families continued; frequent social courtesies and kindnesses were bestowed upon the Thompsons by Mr. Walsh, and in 1900 they all went to Europe on the same steamer. While crossing the ocean, Thompson asked Walsh frequently about the Camp Bird mines, and was told that they were doing better than ever, and yet no sign of discontent escaped him. In October or November, 1900, Mr. Walsh invited Mr. and Mrs. Thompson to dinner at the Waldorf Astoria. During the dinner, Thompson testifies, and his wife supports him, that Walsh asked him if he remembered the Oro Cache claim, and the trip up to it, and said, "I am getting my best ore out of that claim, and I wouldn't take a million dollars for it." Mr. Walsh testified that he said: "Do you remember that ground we passed over in going to the Oro Cache? That could have been bought for a trifle at that time, and it is worth a million dollars now." The facts in the case support Mr. Walsh's memory. There is no evidence which even tends to show that any ore of value has been found on the Oro Cache claim, and the guesses of experts as to what may be found a thousand feet below the surface are chimerical in the extreme. And again, if Walsh said at that dinner what Mr. and Mrs. Thompson charge him with having said, and if the bearing of the Oro Cache trip upon their future was then first spread before their eyes, neither of them acted as normal human beings would be expected to act. Walsh's words, like a lightning flash, would have revealed the terrible depravity of his former conduct toward the Thompsons; and yet no protest or appearance of surprise was shown during the rest of the dinner. They left on good terms, and Mrs. Thompson did not bring the matter up with her husband after they had gone away. Thompson set to work immediately to gather up facts for Walsh's discomfiture, and although he very soon had in his hands proof of all the essential facts which he now presents, he continued on friendly terms, so far as the letters show, and as late as February 21, 1901, he asked to be identified with the proposed sale of the Camp Bird properties, so that he could get a commission. Walsh also, in 1901, forgave Thompson a $500 debt, and Thompson accepted that courtesy, while his plan for obtaining one-half of Walsh's fortune went merrily on. In the spring of 1901 a Camp Bird Extension Company was tried upon the public, the chief merit of which appears to have been that its claims adjoined the Camp Bird claims, and might cut into the rich vein. Thompson was the agent for this enterprise, and it is quite clear that he conceived the plan and engineered it.

On July 15, 1901, Thompson wrote to one Wegg, and told his story, which had evidently been prepared with care and after much thought. In this remarkable letter he points out that his friends are surprised that he is not in the rich Camp Bird mine, since "he and Walsh were in many enterprises of that kind"; that they were at that time "together sixty days in the saddle"; that he went with "Tom, and took samples first on the Oro Cache claim"; that he "climbed the hill when it was too steep for Tom"; that this Tom had "at last admitted"; that "this claim was tied up by us jointly for an exceedingly small sum"; that he expects a half interest in Walsh's fortune, and thinks Wegg might get half of the balance. There cannot be found in that letter a single allusion to the important Ouray letter of uncertain date in June, 1896, nor about the trip down to Ouray in response thereto, nor about the "talking it over" at the hotel, which circumstances, when pieced together, spell out the shadowy oral agreement on which this suit is based. In October and November, 1901, Thompson had the supreme audacity to tell Wegg that he had no intention of attacking Walsh in his July letter, and that he depends upon a "higher law than that of the land that will sooner or later see right and justice done." It is unfortunate that the sentiment then set forth was not a true statement of the real situation. It is painful to be forced, by lack of time, to touch lightly upon this remarkable effort to twist trivial things in such a way as to gain great results, because each fresh examination of the proofs strengthens the conclusion already reached, and furnishes further reason for commentary thereon. The alleged agreement, and the proofs which are said to support it, are all susceptible to the charge of being "without form and void." The plaintiff's case is absolutely without the shadow of a foundation.

Let the bill be dismissed, with costs.